UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES - GENERAL

Priority ____
Send ____
Enter ____
Closed ____
JS-5/JS-6 ____
Scan Only ____

**CASE NO.:** CV 10-01301 SJO (VBKx)    **DATE:** October 21, 2011

**TITLE:** James Barron v. Ashland, Inc., et al.

========================================================================
**PRESENT: THE HONORABLE S. JAMES OTERO, UNITED STATES DISTRICT JUDGE**

Victor Paul Cruz                          Not Present
Courtroom Clerk                           Court Reporter

**COUNSEL PRESENT FOR PLAINTIFF:**        **COUNSEL PRESENT FOR DEFENDANTS:**

Not Present                               Not Present

========================================================================
**PROCEEDINGS (in chambers): FINDINGS OF FACT AND CONCLUSIONS OF LAW**

The instant case arises under the Employee Retirement Income Security Act of 1974 ("ERISA"). The Court found this matter suitable for disposition without oral argument and vacated the trial date set for March 18, 2011. *See Kearney v. Standard Ins. Co.*, 175 F.3d 1084, 1094-95 (9th Cir. 1999) (en banc) ("[T]he district court may try the case on the record that the administrator had before it."). The parties also submitted the bench trial for decision on the briefs. (*See* Docket No. 56, at 2:3-5.) Having carefully reviewed the administrative record and the arguments of counsel, the Court makes the following findings of fact and conclusions of law pursuant the Federal Rule of Civil Procedure ("Rule") 52. Any finding of fact which is more appropriately deemed a conclusion of law, or vice versa, is so deemed. For the reasons discussed below, the Court enters judgment in Plaintiff James Barron's ("Plaintiff") favor.

I.    **FINDINGS OF FACT**

1. Ashland, Inc. ("Ashland") is the designated plan administrator of the Ashland Long Term Disability ("LTD") Plan ("Plan"). (Administrative Record ("A.R.") 992-1000.) The Plan grants Ashland, the plan administrator, the right to "delegate fiduciary responsibilities to one or more persons . . . to render advice with respect to its fiduciary duties." (*Id.* at 1000.) Ashland designated Prudential Insurance Company of America ("Prudential") (collectively, "Defendants") with "the authority and responsibility to decide claims for plan benefits." (*Id.* at 1580.) The Plan states that "Prudential is the 'appropriate named fiduciary' under [ERISA]." (*Id.*) Prudential, thus, is a claim administrator of the Plan. (*Id.* at 997.)

2. Under the Plan, an employee is considered disabled and eligible for benefits for the first 24 months if medical evidence, satisfactory to the claim administrator, shows that the employee cannot perform the functions of his regular occupation. (A.R. 994.) After the first 24 months, an employee is deemed disabled and eligible for benefits if the employee is unable to perform the physical functions of any occupation for which he is reasonably qualified by education, training, and experience, or for which he may be reasonably retrained or rehabilitated. (*Id.*) An employee

**UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

CASE NO.:  <u>CV 10-01301 SJO (VBKx)</u>          DATE:  <u>October 21, 2011</u>

who is disabled before the age of 60 will receive benefits until he reaches 65 years old.  (*Id.* at 996.)  The claims administrator may require a claimant to undergo a medical examination at the time a claim is filed or after the claim is approved.  (*Id.* at 994, 997.)

3.  Pursuant to the Plan, if a claim is denied, Prudential is required to include "a description of additional materials or information needed to process the claim" and an explanation "why those materials or information are needed."  (A.R. 998.)  On appeal, Prudential cannot give any deference to the initial claim denial.  (*Id.*)  The Plan also mandates that Prudential consult a health care professional having appropriate training and experience if a decision on the appeal requires medical judgment.  (*Id.*)  Where medical and vocation experts provided advice in connection with a claim, Prudential must identify the experts, irrespective of whether Prudential relied on the given advice.  (*Id.*)  Internal guidelines interpreting the Plan's provisions state that Prudential may not use the same medical consultant at any stage.  (*Id.* at 1092.)

4. Plaintiff was employed by Ashland as a Senior Technology Service Representative. (A.R. 305.)  He is 56 years old and the father of three children.  (*Id.* at 46, 304.)  After graduating from college in 1976, he went to work for The Dow Chemical Company.  (*Id.* at 712.)  During this period, he was traveling 25% of the time.  (*Id.*)  He obtained several patents, co-authored numerous papers, and received several promotions.  (*Id.*)

5.  In 1992, Plaintiff experienced reoccurring flu-like symptoms and extreme fatigue.  (A.R. 451.)  During this period, he underwent extensive and intrusive medical tests to determine the cause of his illness, including blood works, allergy tests, and a sleep study.  (*Id.*)  He was diagnosed with Chronic Fatigue Syndrome ("CFS") in 1995; this diagnosis was confirmed in 1997 by a separate physician.  (*Id.*)  Plaintiff continued to experience fatigue, flu-like symptoms, sleep disorder, headaches, muscle and joint pain, sore throat, and swollen lymph glands.  (*Id.* at 453.)

6.  CFS "is a clinically defined condition . . . characterized by severe disabling fatigue and a combination of symptoms that prominently features self-reported impairments in concentration and short-term memory, sleep disturbances, and musculoskeletal pain." *Salomaa v. Honda Long Term Disability Plan*, 642 F.3d 666, 677 (9th Cir. 2011).  "The origins of . . . CFS are either unknown or not properly understood, [its] symptoms are largely subjective and vary in intensity from patient to patient." *Linich v. Broadspire Servs., Inc.*, No. CV-05-2983, 2009 WL 775471, at *9 (D. Ariz. Mar. 23, 2009).  "CFS present[s] problems in the world of disability law; for plan administrators who have to determine the weight of a claimant's highly subjective symptoms, and for reviewing courts who ultimately pass over their judgment."  *Id.*

7.  Plaintiff's health deteriorated profoundly in 1999.  (A.R. 456.)  He began to work part-time, working approximately three to four days out of the week.  (*Id.*)  In September 1999, he went on medical leave for several months.  (*Id.*)  After, the Dow Chemical Company allowed Plaintiff to work half time for half the pay.  (*Id.* at 713.)  Plaintiff eventually recuperated enough to work full-time again.  (*Id.*)

**UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

**CASE NO.:   CV 10-01301 SJO (VBKx)**              **DATE:  October 21, 2011**

8.  In 2004, Plaintiff's business unit was sold to Ashland. (A.R. 714.) Ashland interviewed and hired Plaintiff to do similar work. (*Id.*) The new position with Ashland, however, required more traveling - up to three to four days per week. (*Id.*) Most of the customer sites he visited were in the Gulf Coast with 110 degrees Fahrenheit and 90% humidity. (*Id.*) In 2006, Plaintiff noticed his health deteriorating, especially after a two-week, high-profiled business trip to the Philippines. (*Id.*) After the trip, he found himself not able to get out of bed. (*Id.*) Plaintiff could not travel to see customers and, if he did, he did not have the strength to work. (*Id.*) He could not concentrate, lost track of assignments, and was unable to do menial tasks. (*Id.*)

9.  Plaintiff stopped working on August 6, 2007. (A.R. 308.) On August 19, 2007, he submitted his claim for LTD benefits. (*Id.* at 304.) With his application, he provided medical records from Dr. Cheney and Dr. De Voke, a record of his CFS Health History, and an Activities of Daily Living Questionnaire. (*Id.* at 9-18.) In the application, he testified that he had to lay in bed or on the couch when not working because of the fatigue. (*Id.* at 10.) The medical records also showed that his cardiac index went from 3.6 in 2005, to 2.5 in 2006, to 1.76 in 2007. (*Id.*) The normal range of cardiac index is 2.6 - 4.2 L/min per square meter. Wikipedia, *Cardiac Index*, available at http://en.wikipedia.org/wiki/Cardiac_index (last visited Aug. 10, 2011). A patient may be in cardiogenic shock if his cardiac index falls below 1.8. (A.R. 10.) Plaintiff proffered evidence that low levels of cardiac output correlated to severe CFS. (*Id.* at 43.) Plaintiff also provided testimony regarding his muscle and hip joint pain, which were inflamed and misaligned. (*Id.*) Plaintiff stated that he continued to experience fatigue, flu-like symptoms, sleep disorder, headaches, short term memory loss, sore throat, and swollen lymph glands. (*Id.* at 11-12.)

10.  In November 2007, Prudential questioned Plaintiff on his disability claim. Plaintiff explained that he has been taking aggressive treatments for his sleep disorder; however, he stated that he did not have Sleep Apnea and does not use a C-Pap machine. (A.R. 229.) On January 14, 2008, Prudential spoke by telephone with Troy Wade ("Wade"), Plaintiff's supervisor at Ashland. (*Id.* at 232-33.) Wade explained that Plaintiff "did not have any absences from work," "was a wonderful employee," and "there were no issues." (*Id.* at 233.) Wade stated that Plaintiff would be accepted back to work without a doubt. (*Id.*)

11.  Plaintiff's medical records were reviewed by Dr. Albert Kowalski, a Claim Manager, Vice President, and Medical Director for Prudential. (A.R. 200-02.) Dr. Kowalski did not find the cardiac index results credible and, without evidence, questioned the personnel who performed the test and the equipment used. (*Id.* at 209.) Dr. Kowalski also found "the diagnosis of CFIDS . . . questionable" because, in his opinion, there was "no medical evidence" to support the Plaintiff's subjective testimony. (*Id.* at 201); *but see Saffon v. Wells Fargo & Co. Long Term Disability Plan*, 522 F.3d 863, 866 (9th Cir. 2008) ("[W]e have noted that individual reactions to pain are subjective and not easily determined by reference to objective measurements.").

12.  On January 29, 2008, Prudential denied Plaintiff's claim because it believed that Plaintiff could perform the duties of a chemical engineer. (A.R. 32.) The letter incorporates much of Dr. Kowalski's findings, although the letter never identifies him or his credentials. (*Id.* at 30-33.) No mention is made about Plaintiff's abnormally low cardiac index. (*Id.*) Moreover, Prudential labels

| | |
|---|---|
| **CASE NO.:   CV 10-01301 SJO (VBKx)** | **DATE:   October 21, 2011** |

Plaintiff's position as "sedentary in physical demand level," contrary to the "heavy" designation given by Ashland. (*Id.* at 31.) The letter does identify certain tests that Plaintiff did not undergo, such as a mini-mental status examination, MRI testing, and sleep studies. (*Id.* at 32.) The letter does not mention the sleep study Plaintiff underwent in 1996 which ruled out Sleep Apnea. (*Id.* at 452.) Nor is the conversation with Plaintiff's supervisor in the letter.

13.   Plaintiff appealed the denial of LTD benefits on January 29, 2008, submitting additional documentation, including rebuttal letters from Plaintiff and Dr. Cheney. (A.R. 34-51.) In his rebuttal letter, Plaintiff pointed out the discrepancy between Ashland's description of his position as "heavy" versus Prudential's characterization of "light" physical demand. (*Id.* at 34.) He also explained that he has not been able to work with CFS for the past 13 years; rather, he has had to take multiple leaves of absence and work part-time. (*Id.*) Lastly, he stated that Prudential ignored his declining health, as evidence by his abysmal cardiac index. (*Id.* at 35.) Dr. Cheney, in addition to mentioning Plaintiff's cardiac output, explained that Plaintiff exhibited "reversed cortisol response" to exercise, falling from 5.6 mcg/dl pre-exercise to 3.4 mcg/dl. (*Id.* at 48.) Cortisol is released by the adrenaline gland in response to stress, like physical exercise. (*Id.*) Dr. Cheney stated that individuals with CFS are known to have defects in their stress response system and that the reverse cortisol response "render[s] . . . [Plaintiff] incapable of sustained activity in any workplace environment." (*Id.*) Dr. Cheney also highlighted that there is evidence of severe reduction in oxygen consumption by Plaintiff at peak exercise, which is commonly found in people with CFS. (*Id.*)

14.   Prudential denied Plaintiff's first request for reconsideration. (A.R. 58.) In denying the appeal, Prudential relied on two health care processionals to review Plaintiff's claim. (*Id.* at 53-56.) The denial of LTD benefits were based on their expert advice. (*Id.*) Yet, Prudential did not disclose the identities of the experts. (*Id.* at 58-62.) They were Dr. Paul Howard and Dr. Mark Eaton. (*Id.* at 354-60, 371-74.) The letter denying the appeal contained no evaluation of the evidence provided by Dr. Cheney regarding Plaintiff's low oxygen consumption, reverse cortisol response to stress, and low cardiac index. (*Id.*) Instead, Dr. Howard "deferred" evaluations on the evidence, while Dr. Eaton made no mention of it. (*Id.* at 60-61.) The letter seemingly repeats the same reasoning over and over again, as if it were a cut and paste. (*Id.* at 61 (repeating several sentences word for word).) In response to Plaintiff pointing out the discrepancy in the description of his position, Prudential stated that Plaintiff had "the functional capacity to perform sedentary, light, medium or heavy work activity." (*Id.*) Prudential wrote that Plaintiff provided no evidence of motor weakness, joint abnormalities, muscular atrophy or neurologic abnormalities, abnormalities in station or gait, or measures of impaired cognition or memory. In doing so, Prudential ignored Plaintiff's self reporting and other evidence.

15.   On March 10, 2009, Plaintiff submitted a second appeal with new documentation in support of his claim. Included with his appeal, Plaintiff provided a neuropsychological report by Dr. Bastien, a cardiopulmonary evaluation by the Pacific Fatigue Laboratory, a brain SPECT Scan, Dr. Cohen's Neurological Consultation evaluation, and Dr. Silverman's Disability Evaluation. Plaintiff's brain SPECT Scan was "markedly abnormal, suggesting serious brain dysfunction." (A.R. 557) There was evidence of mild scalloping (lack of smoothness) of the brain, which is

"often associated with toxic exposure . . . infection or oxygen deprivation. It may be seen present when overall activity is very low." (*Id.* at 593.) The Pacific Fatigue Laboratory evaluation stated that, despite providing excellent effort, Plaintiff's pulmonary ventilation (lung function) was less than 40% of a normal individual. (*Id.* at 577.) Such "abnormally low" respiratory rate can cause "a prolonged recovery period after physical exertion." (*Id.*) In addition, Plaintiff's oxygen consumption during physical exertion was 57% of a normal individual. (*Id.* at 576.) The evaluation placed Plaintiff "in the moderate to severe functional impairment category." (*Id.*) Plaintiff's neurological test showed several areas where he was below normal. For instance, his verbal fluency was below the cutoff for brain damage. (*Id.* at 554.) His ability to recall contextual verbal material was below average, and his memory was moderately to severely impaired. (*Id.* at 553.) His motor skills were also mildly impaired. (*Id.* at 552.) Plaintiff's treating physicians concluded that Plaintiff "remains totally disabled due to his chronic fatigue." (*Id.* at 670.)

16. Not surprisingly, Prudential again dismissed Plaintiff's appeal. (A.R. 185.) In denying the second request for reconsideration, Prudential relied on three health care professionals, none of whom were identified in the letter. (*Id.*) Two of the medical experts were Dr. Howard and Dr. Eaton, the same individuals who conducted the review of the first appeal. (*Id.* at 361-67, 375-78.) Prudential dismissed the SPECT Scan because "many of the abnormalities are seen in normal individuals." (*Id.* at 188.) Prudential, however, did not explain the other abnormalities like the mild scalloping of the brain that are not present in normal individuals. (*Id.*) Prudential's cardiology physician ignored the Pacific Fatigue Laboratory evaluation. In fact, that test was not mentioned at all in the letter, despite Dr. Howard finding it "of great interest" because "it appears that he has a reduced aerobic threshold." (*Id.* at 366.) Yet, Dr. Howard again deferred to analyze the data because he "is not an expert in exercise physiology." (*Id.*)

17. The letter also failed to include the fact that, in March 2009, Prudential authorized surveillance on Plaintiff, and he was surveilled on March 19, 20, and 21. (*Id.* at 163, 219.) After 24 hours of surveillance, Prudential found no activity by Plaintiff to suggest he was not disabled. (*See id.*) In fact, Prudential's hired investigator found that, "[t]hrough sources in the area, . . . [Plaintiff] is rarely observed outside conducting any type of physical labor or yard work. Furthermore[,] [Plaintiff] is mainly present at [his] residence throughout the day." (*Id.* at 167.)

18. After the denial of the second appeal, Plaintiff continued to submit documentation. On July 19, 2009, Plaintiff submitted comments by Dr. Daniel Amen, rebutting Prudential's finding that the SPECT scan was not abnormal. (A.R. 1208.) Plaintiff also informed Prudential that the Social Security Administration ("SSA") determined him to be "disabled and unable to engage in any occupation," and therefore, awarded him benefits. (*Id.* at 1213.) On August 24, 2009, Prudential's Medical Director Joyce Bachman, M.D., chose to review the Pacific Fatigue Laboratory's report and evaluated it. (*Id.* at 2690.) In response to Dr. Bachman's letter, Plaintiff submitted a rebuttal letter from the Pacific Fatigue Laboratory. (*Id.* at 1224-25.) Prudential agreed to reconsider Plaintiff's claim by reviewing some of the additional evidence provided by Plaintiff. (*Id.* at 1254 (stating that Prudential "will review letter from Pacific Fatigue Laboratories with Dr. Bachman to determine if this alters [its] position").

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES - GENERAL

CASE NO.: CV 10-01301 SJO (VBKx)          DATE: October 21, 2011

II.   Conclusions of Law

   A.   Standard of Review

1. Plaintiff argues that a *de novo* standard of review should apply to Prudential's denial of Plaintiff's application for LTD benefits. (Pl.'s Opening Br. 11:18-20.) Plaintiff asserts that: (1) the Plan language supports a finding that review should be *de novo*; (2) no deference should be given to Ashland because Prudential exercised discretion and denied Plaintiff's claim; and (3) Prudential was not granted authority to determine eligibility for benefits or to construe the terms of the Plan. (*Id.* at 11:26-12:22.)

2. Under section 502 of ERISA, a beneficiary or plan participant may sue "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B) (2006). "[A] denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). "Where the plan provides . . . 'the administrator or fiduciary *discretionary authority* to determine eligibility for benefits,' . . . a *deferential standard* of review [is] appropriate . . . ." *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 111 (2008) (citations omitted).

3. "[A] deferential standard of review does not mean that the plan administrator will prevail on the merits." *Conkright v. Frommert*, ___ U.S. ___, 130 S. Ct. 1640, 1651 (2010). Rather, "[i]t means only that the plan administrator's interpretation of the plan 'will not be disturbed if reasonable.'" *Id.* An ERISA plan administrator's decision to deny benefits is an abuse of discretion "only if it (1) renders a decision without explanation, (2) construes provisions of the plan in a way that conflicts with the plain language of the plan, or (3) relies on clearly erroneous findings of fact." *Boyd v. Bert Bell/Pete Rozelle NFL Players Ret. Plan*, 410 F.3d 1173, 1178 (9th Cir. 2005); *see also Khani v. Regence Blueshield*, No. C09-1067, 2011 WL 4383655, at *10 (W.D. Wash. Sept. 20, 2011) (A plan administrator abuses its discretion when its "decision conflicts with the plain language of the plan."). "Judicial review of an ERISA plan administrator's decision on the merits is limited to the administrative record . . . ." *Montour v. Hartford Life & Acc. Ins. Co.*, 588 F.3d 623, 632 (9th Cir. 2009).

4. In light of the Plan's language granting discretion to Prudential, the Court is obliged to review Prudential's denial of LTD benefits for an abuse of discretion. The Plan expressly provides that "[t]he plan administrator has all the necessary, appropriate and convenient power and authority to interpret, administer and apply the provisions of the plan with respect to all persons having or claiming to have any rights, benefits, entitlements or obligations under the plan." (A.R. 1000.) The Plan also grants Ashland, the plan administrator, the right to "delegate fiduciary responsibilities to one or more persons . . . to render advice with respect to its fiduciary duties." (*Id.*) The Plan delegates Prudential "the authority and responsibility to decide claims for plan benefits." (*Id.* at 1580.) It also states that "Prudential is the 'appropriate named fiduciary' under [ERISA]." (*Id.*)

5. Plaintiff's arguments in support of a *de novo* standard of review are unpersuasive. Plaintiff concedes that "Prudential denied the claim, not Ashland." (Pl.'s Opening Br. 12:14.) Plaintiff, however, immediately thereafter asserts that "Prudential as claims administrator was not granted any discretion." (*Id.* at 12:17-19.) Prudential cannot exercise discretion to deny a claim if no discretion was given to it. If Prudential denied the claim, which Defendant is not disputing, then Prudential must have had the discretion to deny Plaintiff's claim under the Plan.

6. More importantly, Ninth Circuit precedent runs squarely against Plaintiff's position. In *Saffon*, 522 F.3d at 866, the plaintiff similarly argued that *de novo* review should apply because the plan's discretionary clause was allegedly ambiguous. The Ninth Circuit rejected the plaintiff's argument. *Id.* at 867. It explained that "[a] 'fiduciary' is an entity with 'any discretionary authority' in the 'administration of' an ERISA plan." *Id.* at 866. The appellate court held that the claim administrator had discretionary authority because the plan stated that the claim administrator had authority to interpret the terms of the contract and to determine whether a claimant is disabled. *Id.* at 866-67. Similarly, here, the Plan expressly states that "[t]he sole authority to decide upon benefit claims has been delegated to Prudential, with one exception. The exception relates to claims denied due to a failure to properly file within one year from the last day [a claimant] [was] actively at work." (A.R. 1581.) The provisions in the Plan "leave no doubt that [Prudential] is an entity with discretionary authority to administer the Plan." *See Saffon*, 522 F.3d at 867.

7. Accordingly, the Plan gives Prudential "*discretionary authority* to determine eligibility for benefits," *see Metro. Life Ins. Co.*, 554 U.S. at 111, and the Court is required by Supreme Court precedent to review Prudential's exercise of that discretion under an abuse of discretion standard.

   B.   <u>No Structural Conflict of Interest</u>

8. Plaintiff asserts that a conflict of interest exists because "Prudential is getting paid to process the LTD claims for Ashland." (Pl.'s Opening Br. 14:21-22.) Plaintiff posits that "Prudential has a financial motive to keep Ashland happy by keeping its LTD costs low . . . by denying claims." (*Id.* at 22-23.)

9. A conflict of interest exists when "the entity that administers the plan, such as an employer or an insurance company, both determines whether an employee is eligible for benefits and pays benefits out of its own pocket." *Metro. Life Ins. Co.*, 554 U.S. at 108; *see also Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 965 (9th Cir. 2006) ("We have held that an insurer that acts as both the plan administrator and the funding source for benefits operates under what may be termed a structural conflict of interest."). The existence of a structural conflict of interest, however, does not alter the standard of review. The Supreme Court has instructed district courts that a fiduciary "operating under a systemic conflict of interest is nonetheless still entitled to deferential review." *Conkright*, 130 S. Ct. at 1643. The conflict of interest "must be weighed as a 'facto[r] in determining whether there is an abuse of discretion.'" *Firestone Tire & Rubber*, 489 U.S. at 115. The significance of the conflict of interest "will depend upon the circumstances of the particular case." *Metro. Life Ins. Co.*, 554 U.S. at 108; *see also Abatie*, 458 F.3d at 968 ("[W]eighing a conflict of interest as a factor in abuse of discretion review requires a case-by-case

**UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

| | | |
|---|---|---|
| **CASE NO.:** CV 10-01301 SJO (VBKx) | **DATE:** | October 21, 2011 |

balance . . . . A district court, when faced with all the facts and circumstances, must decide in each case how much or how little to credit the plan administrator's reason for denying insurance coverage."). The Ninth Circuit recently refined the proper standard of review by holding that the "'*any* reasonable basis' test is no longer good law when . . . an administrator operates under a structural conflict of interest." *Salomaa*, 642 F.3d at 673-74.

10. Here, there is no structural conflict of interest. Case law supports the conclusion that a structural conflict of interest is not created merely because a claim administrator is paid by the plan administrator for its services. *See, e.g.*, *Winkler v. Aetna Life Ins. Co.*, No. CV-08-8269, 2010 WL 1848199, *8 (C.D. Cal. May 3, 2010) ("[T]he plan is funded by the American National Red Cross and administered by Aetna. Accordingly, there is no structural conflict of interest that would warrant heightened scrutiny under an abuse of discretion standard.") (citation omitted); *Day v. AT&T Disability Income Plan*, 733 F. Supp. 2d 1109, 1113 (N.D. Cal. 2010) ("[T]here is no structural conflict . . . because the Plan grants unreviewable decision[ ]making authority to the Claims Administrator.") (citation omitted). Nonetheless, in reviewing "all the facts and circumstances" of the matter, the Court may take note that Prudential maintains a contract with Ashland to provide claim administration services. Prudential "has an incentive to maintain that contract by keeping the cost of [Ashland]'s disability benefit program low." *Burnett v. Raytheon Co. Short Term Disability Basic Benefit Plan*, 784 F. Supp. 2d 1170, 2011 WL 1429575, at *10 (C.D. Cal. 2011). This is simply one factor to weigh in determining whether there was an abuse of discretion. *Id.*

        C.      <u>Review of the Administrative Record</u>

11. In *Abatie*, 458 F.3d at 972-73, the Ninth Circuit held that "[w]hen a plan administrator has failed to follow a procedural requirement of ERISA, the [district] court may have to consider evidence outside the administrative record." The appellate court stated that, "[e]ven when procedural irregularities are small[ ] . . . and abuse of discretion review applies, the [district] court may take additional evidence when the irregularities have prevented full development of the administrative record." *Id.* at 973. The district court "may, in essence, recreate what the administrative record would have been had the procedure been correct." *Id.*

12. Plaintiff objects to the administrative record as offered by Defendants. He argues that the administrative record should include all documents before the administrator when Prudential denied to reopen the case. (Pl.'s Objection of Incomplete Claim File 3:10-4:26.) Plaintiff asserts that Prudential reviewed evidence up to August 24, 2009. (A.R. 1254.) Defendants do not dispute this, but claim that the administrative record should not contain any documents submitted after April 28, 2009. (Defs.' Resp. 3:11-4:2.) They contend that Prudential never agreed to reconsider Plaintiff's claim after April 28.

13. The record shows clearly that Prudential did reconsider Plaintiff's claim by reviewing some of the additional evidence provided by Plaintiff. (A.R. 1254 (stating that Prudential "will review letter from Pacific Fatigue Laboratories with Dr. Bachman to determine if this alters [its] position"). In doing so, Prudential arbitrarily chose to review certain additional documentation, while ignoring

others, such as the finding by the SSA that Plaintiff is disabled and unable to engage in any occupation.  *Id.*  Defendants are correct that "[t]he administrative [review] process must end at some point," *Davidson v. Prudential Ins. Co. of Am.*, 953 F.2d 1093, 1096 (8th Cir. 1992) (alterations in original), and ERISA does not require them "perpetually to hold open" a claim, *Loughray v. Hartford Grp. Life Ins. Co.*, 366 F. App'x 913, 928-29 (10th Cir. 2010) (unpublished). This, however, does not mean that Defendants can reopen Plaintiff's claim only to choose certain documents to shoot down.  Such an arbitrary and capricious decision does not constitute a "full and fair" administrative review.  Moreover, Defendants' reliance on *Loughray* is misplaced.  In that case, the plan administrator had "twice reopened the file to reconsider its decision and allow [the claimant] to supplement her file - once at her request and once at the request of a state agency." *Id.* at 928.  *Loughray* does not stand for the proposition that once a claim administrator reconsiders its decision that it may deny the claimant a chance to supplement the file.  Nor does it say that claim administrators can selectively reconsider new evidence.

14.  Accordingly, the procedural irregularities of this case require the Court to review the entire administrative record before Prudential when it reconsidered its denial of Plaintiff's claim.[1] Plaintiff's objection is sustained.  The Court takes into consideration the SSA's grant of disability benefits to Plaintiff and its finding that he cannot engage in any occupation.  *See Montour*, 588 F.3d at 635 ("While ERISA plan administrators are not bound by the SSA's determination, complete disregard for a contrary conclusion without so much as an explanation raises questions about whether an adverse benefits determination was 'the product of a principled and deliberative reasoning process.'").

     D.    <u>Prudential Is a Proper Party to the Action</u>.

15.  Defendants assert that Prudential is not a proper party to the instant action because it is not the Plan or the plan administrator.  As a third-party claim administrator, Defendants allege that Prudential cannot be named in a suit under § 1132(a)(1)(b).  They cite to *Ford v. MCI Commc'ns. Corp. Health & Welfare Plan*, 399 F.3d 1076, 1081 (9th Cir. 2005), as legal support.  Unfortunately for Defendants, the Ninth Circuit expressly overruled *Ford* and has held that "potential liability under 29 U.S.C. § 1132(a)(1)(B) is not limited to a benefits plan or the plan administrator." *Cyr v. Reliance Standard Life Ins. Co.*, 642 F.3d 1202, 1207 (9th Cir. 2011) (en banc).  Prudential, which is "responsible for paying legitimate benefits claims," is a "logical defendant for an action . . . authorized by § 1132(a)(1)(B)." *Id.*  Accordingly, Prudential is a proper party.

---

[1] Were the Court to overrule Plaintiff's objection and review the administrative record up to April 28, 2009, the Court would nonetheless reach the same conclusion: Defendants abused their discretion in denying Plaintiff LTD benefits.  Whether the SSA considers Plaintiff completely disabled does not change the record, which clearly shows that Prudential's decision to deny benefits was made in violation of the Plan's provisions, that Plaintiff did not receive a full and fair review, and that the denial was unreasonable.

### E.  Abuse of Discretion

#### 1.  Conflict with Plain Language of the Plan

16. Prudential violated numerous provisions of the Plan during its review of Plaintiff's claim and, therefore, abused its discretion. *See Boyd*, 410 F.3d at 1178; *Khani*, 2011 WL 4383655, at *10. First, the Plan mandates that Prudential identifies any health care professional who provided advice relating to Plaintiff's claim, regardless of whether Prudential actually relies on the advice. (A.R. 998.) At all three levels of the process - the initial denial of benefits, the first appellate review, and the second appellate review - Prudential failed to meet its obligations to disclose the identities of its reviewing physicians. In the initial denial letter, Prudential did not disclose that Dr. Kowalski reviewed Plaintiff's application, or state that Dr. Kowalski's evaluations were the bases for denial. (*Id.* at 30-33, 200-02.) Similarly, Prudential failed to disclose that Dr. Howard and Dr. Eaton reviewed the first and second appeals. (*Id.* at 58-62, 185-88, 354-78.) Prudential also did not disclose the identity of the third medical expert whose input was used to deny Plaintiff's second appeal. Without the identities of Prudential's experts and their evaluations, Plaintiff could not properly rebut the issues raised by the experts and put forth a proper appeal. *See Salomaa*, 642 F.3d at 680 (finding that a plan's failure to provide copies of its physicians' evaluations deprived the claimant of an opportunity to respond to the evaluations and "denied him the statutory obligation of a fair review procedure").

17. Second, and more egregious, Prudential failed to hire medical experts with appropriate training and experience to decide on Plaintiff's claim. The Plan mandates that Prudential consult a health care professional that has the proper training and experience to advise Prudential when an appellate decision requires medical judgment. (A.R. 998.) On two separate occasions, this provision in the Plan was clearly violated. In the denial letter for Plaintiff's first appeal, the letter expressly stated that "[c]ardiac evaluation is deferred as it is out of the scope of the reviewer's expertise." (*Id.* at 60.) Evaluation on Plaintiff's history of low cardiac output was also deferred. (*Id.*) Aside from general comments about the lack of objective evidence, the letter does not mention the Plaintiff's abnormally low cardiac index, which is indicative of severe CFS. Another example is Prudential's failure to investigate the Pacific Fatigue Laboratory study submitted by Plaintiff and to explain why the study did not alter the prior assessment. (*Id.* at 188.) The study "classified . . . [Plaintiff] as moderately-to-severally functionally impaired." (*Id.* at 364.) "Despite providing excellent effort," Plaintiff showed "abnormalities in the metabolic, cardiovascular and pulmonary systems during exercise." (*Id.* at 112.) The test results showed that the "early anaerobic threshold . . . occur[s] [in Plaintiff] at 33% of predicted values indicat[ing] that . . . . a quantifiable limitation of [Plaintiff's] ability to function in any work environment." (*Id.*) Dr. Howard wrote, "The Pacific Fatigue Laboratory study is of great interest. . . . At face value[,] it appears that he has a reduced aerobic threshold." (*Id.* at 366.) Dr. Howard, however, declined "to more critically analyze this study" because he "is not an expert in exercise physiology." (*Id.*) More disconcerting is that no other reviewing physician seemingly analyzed the tests or investigated the study, whose results were "interesting" only because it supported Plaintiff's LTD claim. In denying Plaintiff's second request for reconsideration, Prudential summarily stated "that the new medical documentation . . . does not alter the prior assessment." (*Id.* at 188.) Not only does this violate

CASE NO.: **CV 10-01301 SJO (VBKx)**     DATE: **October 21, 2011**

the Plan's provisions, it violates Ninth Circuit law. *Salomaa*, 642 F.3d at 680 ("An administrator does not do its duty under the statute and regulations by saying merely 'we are not persuaded' or 'your evidence is insufficient.'").

18. Third, Prudential violated the Plan's provision that precludes the use of the same experts at different stages of review. (A.R. 1092.) This provision ensures a "full and fair review" because a reviewing expert will not be unduly influenced to adopt the previous decision. Prudential, however, used both Dr. Howard and Dr. Eaton to deny Plaintiff's first and second appeal. Neither Dr. Howard nor Dr. Eaton had an incentive to carefully review the additional evidence provided by Plaintiff during the second appeal.

19. Accordingly, Prudential construed provisions of the Plan in a way that conflicted with the plain language of the Plan, thereby abusing its discretion in denying Plaintiff's claim for LTD benefits.

   2. Reclassification of Plaintiff's Job Duties

20. The abuse of discretion finding is supported by the record, which shows numerous procedural irregularities and potential bad faith. For instance, Prudential's reclassification of Plaintiff's occupation as "light" rather than "heavy" is suspicious and the Court views the act skeptically. Plaintiff's employer classified his position as a senior technology service representative and designated the position as "heavy." (A.R. 309.) The "heavy" designation means that the position requires the frequent lifting of 25 - 50 lbs of weight and the occasional lifting of 50 - 100 lbs of weight. (*Id.*) The employer also stated that the position required the employee to walk and stand over 50% of the time. (*Id.*) This designation is further supported by Plaintiff's description of the demands of his job. As a senior technology service representative, Plaintiff has "to travel extensively to customer manufacturing sites." (*Id.* at 34.) He explained to Prudential that he spent 85 nights in hotels in 2006. (*Id.*) On average, Plaintiff is required to travel a minimum of at least three to four days a week to provide on-site services to chemical manufacturing plants. (*Id.* at 134.) Prudential also acknowledged that Plaintiff had to travel to the Philippines for work. (*Id.* at 31.) Despite the employer's assessment and Plaintiff's testimony, Prudential classified the position as "light" and "sedentary in physical demand level." (*Id.* at 31, 196.) In its first reconsideration of its decision, Prudential did not address the employer's assessment or Plaintiff's testimony relating to the demands of the job. (*Id.* at 62.) The record does not support Prudential's assessment, and the discrepancy between the employer's assessment and Prudential's categorization is weighed in favor of finding an abuse of discretion. *See Lang v. Long–Term Disability Plan of Sponsor Applied Remote Tech., Inc.*, 125 F.3d 794, 799 (9th Cir. 1997) (reversing a district court's affirmance of a benefits denial where an administrator took inconsistent positions regarding the claim and reasons for denial).

///

**UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

**CASE NO.:** CV 10-01301 SJO (VBKx)          **DATE:** October 21, 2011

         3.         <u>Withholding of Favorable Evidence</u>

21. Federal law "requires an ERISA plan to furnish 'all documents, records, and other information relevant for benefits to the claimant.'" *Salomaa*, 642 F.3d at 680 (citing 29 C.F.R. § 2560.503-1(h)(2)(iii)). Sister district courts have found failure by a plan administrator to provide surveillance tapes to a claimant "troubling." *See, e.g.*, *Finley v. Hartford Life and Accident Ins. Co.*, No. C 06-6247, 2007 WL 2406872, at *4 (N.D. Cal. Aug. 20, 2007).

22. In denying Plaintiff's LTD claim, Prudential should have acknowledged the surveillance conducted on Plaintiff and factored such evidence into its decision. In March 2009, Prudential authorized surveillance on Plaintiff, and he was surveilled on March 19, 20, and 21. (A.R. 163, 219.) After 24 hours of surveillance, Prudential found no activity by Barron to suggest he was not disabled. (*See id.*) In fact, Prudential's hired investigator found that, "[t]hrough sources in the area, . . . [Plaintiff] is rarely observed outside conducting any type of physical labor or yard work. Furthermore[,] [Plaintiff] is mainly present at [his] residence throughout the day." (*Id.* at 167.) These objective facts support Plaintiff's claim that he has "severe intolerance to physical activity," that he suffers from "[p]ost-exertional fatigue and flu-like symptoms . . . after moderate exertion," and that his "oldest son lives with [him] and performs inside and outside household maintenance duties." (*Id.* at 11, 14, 35.) Plaintiff asserts that Prudential withheld the documentation until after the pendency of litigation. In their Response Brief, Defendants do not deny this assertion. Prudential's withholding of the surveillance not only violates its duty to provide Plaintiff with a full and fair review, but it also reflects a certain amount of bad faith.

23. Similarly, Prudential should have considered and disclosed the statements made by Wade. Wade stated that Plaintiff "did not have any absences from work," "was a wonderful employee," and had "no issues." (A.R. at 233.) He also explained that Plaintiff would be accepted back to work without a doubt. (*Id.*) The supervisor's testimony of Plaintiff's work ethic and employment condition, along with Plaintiff's extensive medical history with CFS, support the conclusion that Plaintiff genuinely suffers from severe CFS that prevents him from being gainfully employed. Prudential's reviewing physicians and claim managers ignored this testimony and did not provide this information to Plaintiff. Accordingly, the failure to consider evidence supporting Plaintiff's LTD claim and to disclose them to Plaintiff denied Plaintiff "the statutory obligation of a fair review procedure." *Salomaa*, 642 F.3d at 680.

         4.         <u>In-Person Medical Examination</u>

24. Plaintiff argues that Prudential's denial of LTD benefits was an abuse of discretion because it "conducted no in-person medical examinations" ("IME") and "relied exclusively on paper reviews." (Pl.'s Brief 15:8-18.) Defendants counter by stating that they are not required to physically examine a claimant, citing out of circuit cases. (Defs.' Opening Br. 9:14-15.)

25. Defendants point out that "[t]he instant case, given its striking similarities to *Salomaa*, should be decided in similar fashion." (*See* Defs.' Opening Br. 16:1-2 (referring to a district court order that was subsequently reversed by the Ninth Circuit).) The Court agrees. In *Salomaa*, the Ninth

**UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

CASE NO.: <u>CV 10-01301 SJO (VBKx)</u>     DATE: <u>October 21, 2011</u>

Circuit considered whether the plan administrator had an opportunity to conduct an IME and whether it declined to do so. 642 F.3d at 676. The claimant made himself "available for examination by [the plan's] physicians." *Id.* The plan administrator "not only did not have its physicians examine [claimant], but [it] also rejected the opportunity to do so." *Id.* The Court of Appeals found the denial of LTD benefits suspect because "[e]very one of [the physicians who personally examined the claimant] concluded, often in dramatic language, that [claimant] was totally disabled by his physical condition." *Id.* The appellate court reasoned that "[a]n insurance company may choose to avoid an independent medical examination because of the risk that the physicians it employs may conclude that the claimant is entitled to benefits." *Id.* Several district courts from other circuits have seemingly held that it is an abuse of discretion for a plan administrator to rely solely on review of the record without conducting an IME. *See, e.g.*, *Strope v. Unum Provident Corp.*, No. 06-CV-628, 2010 WL 1257917, at *7 (W.D.N.Y. Mar. 25, 2010) ("[D]efendant flatly rejected the opinion of plaintiff's treating physician, yet never requested an independent medical examination ('IME') of plaintiff. . . . [T]he court is hard-pressed to find that the decision to deny benefits was based on 'substantial evidence.'"); *Vartanian v. Metro. Life. Ins. Co.*, No. 01-C-2674, 2002 WL 484852, *10 (N.D. Ill. Mar. 29, 2002) ("MetLife relied solely on reviewing doctors['] opinions over those of [plaintiff's] treating doctors. Were MetLife acting in good faith in terminating [plaintiff]'s benefits, it seems it should have hired an independent physician to actually examine [plaintiff]. Had this been done and properly documented, there would be no basis to overturn the decision").

26. Defendants are correct in asserting that "[n]othing in [ERISA] . . . suggests that [Defendants] must accord special deference to the opinions of [Plaintiff's] treating physicians. Nor does [ERISA] impose a heightened burden of explanation on the [Defendants] when they reject a treating physician's opinion." *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 831 (2003). "While the findings and recommendations of [Plaintiff]'s treating physicians are indeed relevant to a fair and full assessment of [the] claim, their opinions . . . need not be given any more weight than other evidence found in the administrative record, including evaluations conducted by plan sponsored peer review physicians." *Linich*, 2009 WL 775471, at *9. That said, pursuant to the Ninth Circuit's binding precedent in *Salomaa*, the Court must also acknowledge and weigh the fact that Defendants declined to conduct a medical examination despite the opportunity to do so. *See Metro. Life Ins. Co.*, 554 U.S. at 108; *Salomaa*, 642 F.3d at 676; *Calvert v. Firstar Fin., Inc.*, 409 F.3d 286, 295 (6th Cir. 2005) ("Thus, while we find that Liberty's reliance on a file review does not, standing alone, require the conclusion that Liberty acted improperly, we find that the failure to conduct a physical examination - especially where the right to do so is specifically reserved in the plan - may, in some cases, raise questions about the thoroughness and accuracy of the benefits determination.").

27. Moreover, the reasoning given by Prudential for not conducting an IME is that "an IME in April 2009 would not help [it] to understand functional impairment and appropriate restrictions and limitations back to August 2007." (A.R. 188.) Plaintiff, however, advised that "CFS does not go away and is a chronic progressive disease . . . ." (*Id.* at 235); *see also* Chronic Fatigue Syndrome, available at http://medical-dictionary.thefreedictionary.com/chronic+fatigue+syndrome (last visited Aug. 30, 2011) ("Some people get progressively worse over time, while others gradually

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

| | |
|---|---|
| **CASE NO.:** <u>CV 10-01301 SJO (VBKx)</u> | **DATE:** <u>October 21, 2011</u> |

improve."); Fibromyalgia Support, *Chronic Fatigue Syndrome*, available at http://www.fibromyalgia-support.org/chronic-fatigue/cfs-definition.html (last visited Aug. 30, 2011) ("CFS is a progressive immune disorder . . . ."). Because CFS may be progressive in individuals like Plaintiff, an IME in 2009 would have been relevant to determine whether Plaintiff was and continues to be fully disabled. Indeed, this is reflected in the record by several of Prudential's own reviewing professionals, who asked, "What is the functional capacity through 11/05/07 and ***beyond***?" (A.R. 194, 357 (emphasis added).)

28. Accordingly, the Court gives equal weight to the opinions of Plaintiff's treating physicians and Defendants' file reviewing physicians. The Court, however, considers and finds suspect the fact that Defendants had the opportunity to conduct a physical examination, but declined to investigate Plaintiff's claims through an in-person evaluation. It casts doubt as to the thoroughness and accuracy of Prudential's decision, and weighs in favor of finding abuse of discretion. *See Montour*, 588 F.3d at 634 ("While the Plan does not require a physical exam by a non-treating physician, in this case that choice 'raise[s] questions about the thoroughness and accuracy of the benefits determination' . . . .") (internal citation omitted and alteration in original).

### 5. Identifying Additional Information

29. Lastly, Plaintiff argues that Prudential abused its discretion by failing to advise him of what additional evidence was required to perfect his claim. For a review to be "fair" under ERISA, the plan administrator must provide "[a] description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary." 29 C.F.R. § 2560.503-1(g)(iii). Thus, "[w]hen an administrator tacks on a new reason for denying benefits in a final decision, thereby precluding the plan participant from responding to that rationale for denial at the administrative level, the administrator violates ERISA's procedures." *Abatie*, 458 F.3d at 974; *see also Saffon*, 522 F.3d at 872 ("[C]oming up with a new reason for rejecting the claim at the last minute suggests the claim administrator may be casting about for an excuse to reject the claim rather than conducting an objective evaluation.").

30. In several instances, Prudential failed to identify additional material and information needed by Plaintiff to prove his disability. For instance, in the letter denying the second request for reconsideration, Prudential states that Plaintiff's neuropsychological documentation was not convincing because "the general assessment strategy [was] lacking in that detailed psychiatric evaluation was not performed." (A.R. 189.) Upon close review of the letters denying the claim and denying the first request for reconsideration, there is a glaring lack of any mention of the need for a psychiatric evaluation. (*Id.* at 30-33, 58-62.) Nor does Prudential explain why such a test was necessary. The request for a psychiatric evaluation was contained in the last denial; as such, Plaintiff was precluded from proffering the additional information necessary to perfect his claim. This constitutes a violation of ERISA's procedures and a denial of a full and fair review. In other instances, Prudential mistakenly sought information that was not relevant. Prudential stated in its initial denial letter that Plaintiff should conduct a sleep test. Plaintiff, however, explained to Prudential shortly before the denial that he has been treating his sleep disorder, but that he does

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

| | |
|---|---|
| CASE NO.: CV 10-01301 SJO (VBKx) | DATE: October 21, 2011 |

not have Sleep Apnea. The record shows that Plaintiff underwent a sleep test in 1996, which ruled out Sleep Apnea. (*Id.* at 452.)

31. In sum, a review of the record leads the Court to a definite and firm conviction that a mistake has been committed. Although the standard of review is an abuse of discretion, significant procedural irregularities and instances of seemingly bad faith require the Court to review Prudential's decision with substantial skepticism and doubt. In light of Plaintiff's significant evidence that he suffers from severe CFS, the Court finds that Defendants abused their discretion in denying LTD benefits to Plaintiff. In doing so, the Court notes that eligibility under the Plan changes after the first 24 months. After the first 24 months, in order to be eligible for benefits, Plaintiff must show that he is unable to perform the physical functions of ***any*** occupation for which he is reasonably qualified by education, training, and experience, or for which he may be reasonably retrained or rehabilitated. (A.R. 994.) The Court agrees with Plaintiff's treating and reviewing physicians, along with the SSA, that Plaintiff is completely disabled and unable to engage in any employment presently. Nonetheless, Plaintiff has been able to recuperate and recover in the past. As such, the instant order does not precludeDefendants from exercising any rights they have under the Plan. Plaintiff may very well fall outside of the Plan's disability definition in the future. That scenario, however, is not before the Court.

III. CONCLUSION

1. Defendants abused their discretion in denying Plaintiff's LTD benefits.

2. Plaintiff is entitled to LTD benefits under the Plan from August 6, 2007, to the present, without prejudice to Defendants' future exercise of their rights under said Plan.

3. The Court declines to award Plaintiff penalties for failure to produce requested documents.

4. Plaintiff is a prevailing ERISA plaintiff and, therefore, is entitled to attorney's fees. *United Steel Workers of Am. v. Ret. Income Plan for Hourly-Rated Emps. of ASARCO, Inc.*, 512 F.3d 555, 564 (9th Cir. 2008).

5. Plaintiff is entitled to prejudgment interest. *Blankenship v. Liberty Life Assurance Co.*, 486 F.3d 620, 627 (9th Cir. 2007).

6. Plaintiff shall submit a proposed judgment on or before November 7, 2011.

IT IS SO ORDERED